## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HDI GLOBAL SE,<br>SWISS RE INTERNATIONAL SE, STARR EUROPE INSURANCE LIMITED,<br>VIENNA INSURANCE GROUP, and QBE EUROPE SA/NV, as Subrogees of Currenta GmbH & Co. OHG,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>FMC CORPORATION,<br><br>　　　　Defendant. | C.A. No. _____<br><br>**JURY TRIAL DEMANDED** |

### *Complaint*

Plaintiffs HDI Global SE, Swiss Re International SE, Starr Europe Insurance Limited, Vienna Insurance Group, and QBE Re (Europe Limited), as subrogees of Currenta GmbH & Co. OHG, by and through their attorneys, Smith, Katzenstein & Jenkins, LLP, and Denenberg Tuffley, PLLC, hereby file their complaint and against defendant, FMC CORPORATION, and state as follows:

### *Parties*

1. Plaintiff HDI Global SE is a German corporation with its principal place of business in Germany.

2. Plaintiff Swiss Re International SE is a Luxembourg corporation with its principal place of business in Luxembourg.

3. Plaintiff Starr Europe Insurance Limited is a Maltese corporation with its principal place of business in Malta.

4. Plaintiff Vienna Insurance Group is an Austrian corporation with its principal place of business in Austria.

5. Plaintiff QBE Europe SA/NV is a Belgian corporation with its principal place of business in Belgium.

6. Plaintiffs are collectively referred to as "Insurers."

7. At all relevant times, Insurers provided property insurance to nonparty Currenta GmbH & Co. OHG ("Currenta"), a waste-disposal company with multiple locations, including a facility in Leverkusen-Burrig, Germany. That facility includes a hazardous-waste incineration plant with a tank farm for storing liquid waste. Copies of the master insurance policy pertaining to all Insurers are attached as Exhibit 1 (in the original German) and Exhibit 2 (translated to English).

8. Upon information and belief, Defendant, FMC Corporation ("FMC"), is a Delaware corporation with its principal place of business in Pennsylvania.

### *Jurisdiction and Venue*

9. The Court has jurisdiction over this action under 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

10. The Court has personal jurisdiction over FMC under both Delaware's long-arm statute, Section 3104 of Title Ten, and due-process considerations. First and foremost, FMC is incorporated in Delaware. Furthermore, FMC had sufficient minimum contacts with the State of Delaware, as it regularly transacts business in Delaware, and has an interest in, uses, or possesses real property in Delaware. As such, FMC could reasonably anticipate being haled into a Delaware court.

11. For venue purposes, FMC is a resident of the District of Delaware under 28 U.S.C. § 1391(c)(2) because it is an entity with the capacity to sue and be sued in its common name under applicable law and is subject to this Court's personal jurisdiction with respect to the civil action in question. Venue is therefore proper in this Court under 28 U.S.C. § 1391(b)(1) because FMC is the sole Defendant in this action and is a resident of the District of Delaware for venue purposes.

*Factual Allegations*

12. This loss involves a catastrophic explosion and fire at Currenta's hazardous waste incineration facility in Leverkusen-Burrig, Germany (the "Currenta facility"). The incident is currently the subject of civil and criminal litigation in numerous European countries.

13. The genesis of the tragedy occurred in October 2019, when FMC Procurement Analyst Jon Gacutan contacted AVG (a European waste-disposal company similar to Currenta) to inquire whether AVG was interested in being retained to dispose of a waste known as MP-1 residue.

14. MP-1 residue is a liquid waste derived from the production of certain insecticides. Upon information and belief, it was a secondary ingredient in a different substance from its invention in the 1970s until 2019, when that substance was discontinued and MP-1 residue was reclassified as a waste product.

15. AVG expressed interest in the project and began requesting further information from Gacutan and FMC on MP-1 residue's properties and treatment. As part of this process, Gacutan provided MP-1's waste streams information ("WSI") to AVG in December 2019. A copy of the WSI is attached as Exhibit 3.

16. Upon information and belief, this may have been the first time FMC disseminated information on MP-1 residue's composition and properties outside the FMC corporate hierarchy.

3

Further, this was very likely the first time FMC provided such information to any outside party for purposes of MP-1 residue disposal.

17. The WSI apparently provided insufficient information for AVG to move forward. AVG wrote Gacutan in January 2020 that AVG "need[ed] to know the important ingredients . . . very much interesting for us is health and safety information and any possibilities for the reactivity."

18. Gacutan re-sent the WSI to AVG, who continued to insist on further details in keeping with AVG's safety procedures and in the interest of preventing potential accidents.

19. In February 2020, Gacutan sent a partially completed Data Entry Form ("DEF") to AVG with further information. On information and belief, a copy of the DEF provided by Gacutan is attached as Exhibit 4. AVG responded with additional questions, but now had enough detail to request signed copies of the DEF so AVG could begin receiving and disposing of the MP-1 residue.

20. The WSI and DEF provided by FMC featured several dangerous shortcomings. These include (but are not limited to): (A) failing to mention MP-1 residue also contains MP-11, a volatile, self-reactive chemical, (B) incorrectly noting MP-1 residue must be stored at temperatures below 40°C—the residue actually becomes thermally unstable at 34°C, and (C) providing a United Nations hazardous-material transport classification "8" (corrosive liquid, flammable) for the residue, when it should have received a far more dangerous classification "4.1" (self-reactive substance, type F liquid, temperature controlled).

21. After that point, AVG largely communicated about MP-1 residue disposal with employees of FMC's Danish subsidiary, FMC Agricultural Solutions A/S ("FMCAS").[1]

---

[1] FMCAS is not a party to this lawsuit. All allegations of fault herein are directed at FMC only. The fault of FMCAS and others (not including FMC) regarding the Currenta explosion is the subject of separate litigation being contemporaneously filed by the Insurers in Germany.

22. AVG eventually found itself unable to dispose of all the waste from FMCAS. At the direction of FMCAS, AVG contacted Currenta in July 2020 regarding disposal of the FMCAS waste, including MP-1 residue.

23. During the ensuing negotiation and communications between FMCAS, AVG, and Currenta, in December 2020 AVG (at FMCAS' direction) sent the DEF (originally provided by FMC) to Currenta.

24. Currenta eventually agreed to dispose of the MP-1 residue. However, prior to the shipment of any residue to Currenta, FMCAS provided Currenta with a Safety Data Sheet, a copy of which is attached as Exhibit 5. The Safety Data Sheet contained the same shortcomings as were found in both the WSI and DEF

25. Currenta relied on the information contained in the Safety Data Sheet (which appeared to be derived from the earlier WSI and DEF) in determining how to safely store, and then subsequently dispose of, the MP-1 residue.

26. FMCAS shipped a quantity of MP-1 residue (in unrefrigerated tankers) from Denmark to the Currenta facility in July 2021; the residue arrived at the facility on July 26, 2021.

27. Currenta began pumping the MP-1 residue into one of its large storage tanks ("Tank 3") at 11:30 a.m. on July 26, 2021.

28. By 2:44 p.m. that same day, the residue temperature was 35°C. At 4:57 p.m., it had crept higher, to 39.8°C.

29. Currenta employees began to become concerned about the residue's rising temperature very early the next morning, on July 27, 2021. The residue's temperature was now 61.9°C. Pressure in the tank was also rapidly increasing as a result.

30. Currenta employees turned off Tank 3's circulation pump to try to prevent further heating and pressure; when that failed to work, they tried several other methods, including activating a cooling coil in the tank.

31. Despite their efforts, the residue's temperature continued to rise, increasing to 79.7°C by 8:09 a.m. and rocketing to over 100°C by around 9:15 a.m. Currenta alerted the fire brigade around this time and warned them of the rapidly increasing temperatures and pressure.

32. Shortly after 9:30 a.m., the rising pressure exceeded Tank 3's load limit and caused an explosion that ripped the tank apart. The MP-1 residue immediately mixed with the ambient air and ignited, causing another apocalyptic explosion. The explosions started a fire in the facility's tank farm that spread quickly.

33. When the smoke eventually cleared, seven Currenta employees were dead, dozens were injured, and Currenta had suffered over 200,000,000 Euros in property damage.

34. Criminal and regulatory investigations began immediately and resulted, among other findings, in a report to the German parliament from the State of North Rhine-Westphalia's Ministry of the Environment.

35. The authors of the report determined that storing MP-1 residue above its "self-explosion temperature" led the residue to self-heat. This created the exponential temperature and pressure increases in Tank 3 before the explosion. According to the report, the self-heating and attendant temperature and pressure increases occurred so quickly that Currenta's safety devices were simply unable to dissipate the pressure.

36. The report also noted that Currenta had been given no information about MP-1 residue's heat sensitivity; this included information required to store the residue safely, such as its tendency to decompose with simultaneous self-heating and volume expansion.

37.     According to the report, this lack of proper information led Currenta to handle and store the MP-1 residue above its self-heating temperature, directly causing the dramatic temperature and pressure increases and, eventually, the explosion that destroyed Tank 3.

38.     Under Currenta's property-insurance policy, Insurers were obligated to, and did, pay Currenta for the damages.[2]  To date they have paid 199,000,000 Euros (based on current exchange rates, this equates to over $215,740,000 US).

39.     Insurers are therefore subrogated to Currenta's rights of recovery against FMC, to the extent of payments made.

## *Count I — Negligence*

40.     Insurers hereby re-allege and incorporate by reference all foregoing paragraphs as though fully stated herein.

41.     FMC did not have a direct contract with Currenta, and it does not appear FMC ever discussed MP-1 residue directly with Currenta.

42.     FMC did, however, provide the flawed and deficient product information to AVG, which (at FMCAS's direction) was supplied to Currenta.

43.     FMC knew, or should have known, that AVG and any other waste-disposal company (such as Currenta) would rely on FMC's flawed and deficient product information to determine how to store and handle MP-1 residue safely.

44.     FMC knew, or should have known, other waste-disposal companies like Currenta could eventually be asked to dispose of MP-1 residue in the event AVG raised its rates, went out of business, became unable to handle the volume of the waste, or encountered other economic or

---

[2] Currenta's insurance claim to QBE Europe SA/NV may have been originally submitted to an incorrect QBE entity; and while payment was eventually made by QBE Europe SA/NV, additional payments may also have been made by a different QBE entity (QBE UK).

logistical issues. This is certainly true where, as here, it was FMC's subsidiary (FMCAS) who directed AVG to reach out to Currenta regarding disposal of the MP-1 residue and provide Currenta with the flawed information regarding the characteristics of the MP-1 residue.

45. FMC had a common-law duty to exercise the care of a reasonable person to protect foreseeable persons or entities (such as Currenta) against unreasonable risk of harm arising out of its affirmative acts (here providing the original flawed information regarding the properties of MP-1 residue -- an extremely hazardous substance -- to AVG).

46. FMC breached this duty to Currenta by numerous acts and omissions, including:

    a. failing to ensure the information they provided about MP-1 residue, a volatile and hazardous substance, was correct and complete;

    b. failing to note the presence of MP-11, a self-reactive chemical, as an ingredient in MP-1 residue;

    c. claiming the residue needed to be stored at temperatures below 40°C when MP-1 residue actually becomes thermally unstable (and begins the chain reaction of temperature and pressure increases) at 34°C;

    d. providing a United Nations hazardous material transport classification "8" for the residue, when it should have received a far more dangerous (and flammable) classification "4.1," which prevented Currenta from understanding the gravity of any potential improper storage;

    e. failing to correct their flawed and deficient product information for months after initially providing it to AVG, which led both AVG and FMCAS to provide the information to Currenta; and

    f. any other acts or omissions revealed during the course of discovery.

47. FMC created and provided the flawed and deficient information to AVG, which, among other things, led Currenta to handle and store the MP-1 residue above its self-heating temperature, directly causing the dramatic temperature and pressure increases and, eventually, the explosion that destroyed Tank 3 and triggered the destruction of much of the Currenta facility.

48. Had FMC provided correct information regarding MP-1 residue to AVG, this correct information would have been included in the subsequent Safety Data Sheet and other documentation provided to Currenta. Armed with this information, Currenta would have handled and stored the MP-1 residue in a way that the explosion/fire may not have occurred.

49. FMC's affirmative acts were therefore a legal and proximate cause of the Tank 3 explosion and the subsequent catastrophic damages.

50. Currenta suffered more than 200,000,000 Euros in damages as a result of FMC's negligence and the ensuing explosions and fires.

**WHEREFORE**, plaintiff Insurers respectfully request this Court award a judgment against FMC for the damages described herein, together with costs, attorneys' fees and expenses, pre- and post- judgment interest, and any other relief this Court deems just and proper.

## JURY DEMAND

Insurers hereby request a trial by jury for the aforementioned matter.

Dated: July 26, 2024

|  |  |
|---|---|
|  | **SMITH KATZENSTEIN JENKINS LLP** |
| *Of Counsel:* | */s/ Robert K. Beste* |
|  | Robert K. Beste (No. 3931) |
| Todd B. Denenberg | Daniel A. Taylor (No. 6934) |
| Jeffrey R. Learned | 1000 West Street, Suite 1501 |
| Jarett M. Smith | Wilmington, DE 19801 |
| Christopher R. Schaedig | (302) 652-8400 |
| **DENENBERG TUFFLEY, PLLC** | rbeste@skjlaw.com |
| 28411 Northwestern Highway, Ste. 600 | dtaylor@skjlaw.com |
| Southfield, Michigan 48034 |  |
| (248) 549-3900 | *Attorneys for Plaintiffs* |
| tdenenberg@dt-law.com |  |
| jlearned@dt-law.com |  |
| jsmith@dt-law.com |  |
| cschaedig@dt-law.com |  |